# EXHIBIT 5

ADAM FRIESE
August 14, 2023

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

JOHN HUDSON,                        )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 ) Case No. 21-cv-2056
                                    )
DR. JONATHAN EK, DR. JUSTIN T.      )
YOUNG, UNKNOWN EMPLOYEE(S) OF       )
WEXFORD HEALTH SOURCES, INC.,       )
AND WEXFORD HEALTH SOURCES,         )
INC.,                               )
                                    )
        Defendants.                 )

VIDEO DEPOSITION OF CORPORATE DESIGNEE

ADAM FRIESE

APPEARING REMOTELY FROM

DANVILLE, ILLINOIS

August 14, 2023

REPORTED BY:

Tami L. Bruder

CSR No. 084.004804

ADAM FRIESE
August 14, 2023

```
 1        Q.    How are those grievances communicated to
 2   Wexford?
 3        A.    That, I don't know.
 4              MR. KARABETSOS:  Yeah.  That -- that's
 5   beyond the scope of this witness' topic, communications
 6   with Wexford.
 7              MS. LUSK:  Dimitrios, I thought you said
 8   he was going to testify to how those were transferred
 9   to Wex -- or communicated to Wexford and then Miss
10   Chacon was going to testify to the process of working
11   with Wexford to respond.
12              MR. KARABETSOS:  No.  For clarification,
13   Mr. Friese can tell you how the grievances, if they
14   are, how they are sent to Wexford, but not about the
15   communications with Wexford or -- or -- or a medical
16   administrator's medical decisions.  I mean he just
17   doesn't know about that.  He knows about the procedures
18   for the grievances.
19              MS. LUSK:  Okay.  So if my question was
20   unclear, I'm trying to understand how those are
21   transmitted to Wexford.
22              MR. KARABETSOS:  Okay.
23        A.    So when -- when --
24              MR. KARABETSOS:  Go ahead.
```

ADAM FRIESE
August 14, 2023

```
 1              THE WITNESS:  Okay.

 2         A.    When we receive a medical grievance, the

 3   grievance staff will send it to Miss Chacon in the

 4   health care department, and then after that, I'm not --

 5   I don't know what her process is as far as who she

 6   speaks with, but the grievance office, they -- they

 7   give a copy to Miss Chacon in health care, and that is

 8   the extent of us until we receive the grievance back

 9   with an answer.

10   BY MS. LUSK:

11         Q.    And when you say receive the grievance

12   back with an answer, that's receive the grievance from

13   Miss Chacon with her answer?

14         A.    Yes.

15         Q.    Are medical grievances ever considered

16   moot by grievance officers?

17         A.    So our answer that we give is the answer

18   that Miss Chacon supplies to us, so if she, you know,

19   deems it to be moot, a moot point, then, yes, they are

20   considered moot.

21         Q.    Okay.  So grievance officers defer to Miss

22   Chacon's recommendation in ruling on medical

23   grievances; is that correct?

24         A.    Yes.
```

ADAM FRIESE
August 14, 2023

```
 1          Q.    So the grievance officer doesn't do an

 2   independent assessment of the grievance when it's a

 3   medical grievance?

 4          A.    No.

 5          Q.    Do you have an understanding of why it

 6   might be rendered moot or, no, because you don't

 7   understand Miss Chacon's process?

 8          A.    That -- I do not understand -- I'm not in

 9   the medical field, so I don't understand, you know, why

10   they would give that answer.

11          Q.    Does IDOC have authority to make medical

12   decisions for inmates?

13                MR. KARABETSOS:  Objection.  That --

14   that's beyond the scope of this witness' topics.

15          You can answer if you know.

16          A.    I'm sorry.  Can you repeat the question

17   there again?

18   BY MS. LUSK:

19          Q.    Yeah.  Does IDOC have authority to make

20   medical decisions for inmates?

21                MR. KARABETSOS:  Same objection.

22          You can answer personally if you know.

23                MR. SIEVERS:  And objection, calls for

24   legal conclusion.
```

ADAM FRIESE
August 14, 2023

```
 1                    MS. LUSK:  No.  I'm asking him on behalf
 2   of IDOC for -- for clarification.
 3                    MR. KARABETSOS:  And that's beyond the
 4   scope of his -- his topic.
 5         You can answer for yourself if you know, Mr.
 6   Friese.
 7                    MS. LUSK:  But, Dimitrios, that's not my
 8   question.  I'm trying to understand how IDOC rules on
 9   grievances, and part of that is whether or not they
10   have authority to make decisions for medical
11   grievances.  So he's telling me he gets a
12   recommendation from Miss Chacon, and I am trying to
13   understand does IDOC have authority to make medical
14   decisions or do we defer to what comes from Miss
15   Chacon.
16                    MR. KARABETSOS:  Yeah.  That did not have
17   to do with procedures related to handling grievances,
18   but you can answer, Mr. Friese, personally if you know.
19         A.    I personally do not know.
20                    MS. LUSK:  Okay.  We're going to take a
21   break and go off the record.
22                    THE VIDEOGRAPHER:  Going off the record.
23   The time is 14:37 UTC.
24                    (Break was taken.)
```

ADAM FRIESE
August 14, 2023

1        Q.    And you said you send inmates notes

2   through Champ.  How does an inmate access Champ?

3        A.    They can't access it.  We'll put it in

4   Champ, but we can print it -- we'll print it off and

5   send it to them through the institutional mail.

6        Q.    How often are Champ notes sent to inmates

7   through institutional mail?

8        A.    It just depends on if it needs to be sent

9   to them.  Not every Champ note is sent to them, but

10  with a grievance, whenever it's received, like I said,

11  we'll note that in Champ and we'll send that entry to

12  them.

13       Q.    So are Champ entries noting that a

14  grievance has been received always sent to an inmate?

15       A.    Yes.

16       Q.    But other entries in Champ might not

17  necessarily be sent to an inmate?

18       A.    Right.

19       Q.    How do you decide which Champ entries need

20  to be sent to an inmate and which don't?

21       A.    Most entries do not need to be sent to

22  them.  It's -- like if I have an interaction with them,

23  if they come into the counselor's office and ask for

24  their trust fund balance, we'll make note that we spoke

ADAM FRIESE
August 14, 2023

1  to them on that date and gave them their trust fund

2  balance.  That does not need to be sent to them.

3        But something like a grievance, you know, we

4  have received this at the first level, we -- we will

5  then send that to them so that gives them notification

6  that we received their grievance.

7        Q.    Do -- does -- who -- who enters the Champ

8  notes?

9        A.    For grievances?

10       Q.    Yes.

11       A.    Miss Yearm.

12       Q.    And when does Miss Yearm make Champ notes

13  related to grievances?  I know you gave me an example

14  when a grievance is received.  What are other instances

15  of grievance-related notes she might make?

16       A.    So when they -- when they've been

17  received, she'll make a Champ note; when they've been

18  answered at the first level stating that it's been

19  answered at the first level and then returned to the

20  individual, she'll make a Champ note; if they turn it

21  back in, you know, at the second level, any time a

22  Champ or a grievance is sent to the warden's office for

23  review, there will be a Champ note about that.

24       Q.    So is she supposed to make a Champ note

ADAM FRIESE
August 14, 2023

1  about the grievance as it goes through every stage of

2  the review process?

3          A.    Yes.

4          Q.    Does she do that for every grievance that

5  IDOC receives at Danville related --

6          A.    Yes.

7          Q.    Yes.  Sorry.

8          A.    Yes.

9          Q.    And just to make sure I understand, does

10  every Champ note related to the process -- the

11  grievance -- the place the grievance is in the review

12  process, is that sent to an inmate?

13          A.    Yes.

14          Q.    And that's through institutional mail?

15          A.    Yes.

16          Q.    And I think you said an inmate can also

17  check with a counselor on the status of a grievance; is

18  that accurate?

19          A.    Yes.

20          Q.    What does a counselor do once -- if -- if

21  an inmate requests a status update for a grievance?

22          A.    Depending on what level it's at, if the

23  counselor has the grievance, they can give them, you

24  know, wherever they're at in the grievance process, or

ADAM FRIESE
August 14, 2023

1  the counselor can look at the Champ entry and see, Oh,

2  it was submitted at the second level on this date, and

3  they could let them know that, or they can call the

4  grievance office and ask for a further update.

5       Q.   In terms of inmates receiving Champ notes

6  through institutional mail, is IDOC aware of inmates

7  ever complaining that they don't receive notes from

8  Champ via institutional mail at Danville Correctional

9  Center?

10      A.   Not that I'm aware of.

11      Q.   Why does IDOC send Champ notes through

12  institutional mail as opposed to hand delivery?

13           MR. KARABETSOS:  I'm going to object to

14  the -- to the question as beyond the scope of this

15  witness' topic.

16      You can answer personally.

17      A.   There's --

18           MS. LUSK:  Again I -- just -- just so the

19  record is clear, all these questions are posed to him

20  in his -- as his -- in his capacity as a corporate

21  representative for IDOC.

22           MR. KARABETSOS:  This is beyond the scope.

23  This is not procedure.  You're asking for why procedure

24  is in place.  That's beyond the scope of this witness'

ADAM FRIESE
August 14, 2023

 1        Q.    Anyone besides grievance officers or Miss

 2    Yearm?

 3        A.    No.

 4        Q.    And what documents are given to the CAO?

 5        A.    It's a copy of the grievance with the

 6    first level response if it is a first level response,

 7    and then we have a cover page that we do for our second

 8    level response where we summarize the grievance and

 9    then give the answer at second level, and then if

10    there's any other, you know, documents that are turned

11    in with the grievance -- whenever they turn in a

12    grievance, they can have supporting documents, so

13    that's all attached to it.

14        Q.    Does anyone who responded to the grievance

15    ever submit documents supporting the response to the

16    grievance, be that a counselor or Miss Chacon?

17        A.    I mean Miss Chacon, when she answers, like

18    she provides her answer on the grievance, and so that's

19    the answer that we take and put on our second level

20    form.

21        Q.    Okay.  But -- but -- so does Miss Chacon

22    typically not provide any other documents to support

23    that response; it's just the response?

24        A.    Right.

ADAM FRIESE
August 14, 2023

1          Q.    Does an inmate receive the grievance

2    officer's -- a copy of the grievance officer's response

3    while the CAO is reviewing or just the Champ note?

4          A.    We wait until the -- once the CAO has

5    received the -- the grievance, she'll make a

6    determination whether she agrees with our answer or

7    disagrees with it, and then once she makes that

8    determination, a copy is then sent to the individual.

9          Q.    How often are grievances taken to the CAO?

10         A.    On a daily basis as long as there's a

11   grievance officer here, you know, Monday through

12   Friday.

13         Q.    And -- and just so the record is clear,

14   what does CAO stand for?

15         A.    The chief administrator officer.  It's

16   usually the warden at the institution.

17         Q.    Got it.  What steps does a CAO go through

18   to review and respond to a grievance?

19         A.    They don't respond -- they just determine

20   if they're going to agree with the -- with our response

21   or not agree.

22         Q.    Do they speak with any individuals in

23   determining whether they're going to agree or not?

24         A.    You would have to ask them.  I'm not aware

ADAM FRIESE
August 14, 2023

1  of that.

2       Q.   Do you know if they review any additional

3  documents as part of their review?

4       A.   Not that I'm aware of, but you would have

5  to ask them.

6       Q.   So you -- safe to say you don't know what

7  a CAO does as part of their review process?

8       A.   No.  Like I said, they are sent to them,

9  and, you know, whatever they review, they review, and

10 then they just mark whether they concur with our answer

11 or don't concur.

12      Q.   How long does a CAO have to decide whether

13 they concur or don't concur with a ruling on a

14 grievance?

15      A.   I don't know if there's an actual time

16 frame for that or not.

17      Q.   What happens after a CAO makes the

18 decision on a grievance?

19      A.   It's returned back to the grievance

20 office, and that's when we make the Champ note that

21 it's -- what -- the warden, whether she determined it

22 was -- you know, she concurred with the grievance or

23 did not concur with the grievance response, and then

24 it's sent back to the individual.

ADAM FRIESE
August 14, 2023

1       Q.    How is -- how is a grievance determination

2  sent to an individual?

3       A.    Through the institutional mail.

4       Q.    Is a Champ note also sent to the

5  individual?

6       A.    Yes.

7       Q.    Does IDOC do anything to ensure that an

8  inmate receives the final determination through

9  institutional mail?

10      A.    No.

11      Q.    Has IDOC received complaints of inmates

12 not receiving final determinations on grievances

13 through institutional mail at Danville?

14           MR. KARABETSOS:  I'm going to object to

15 the question, beyond the scope of the topic, but you

16 can go ahead.

17      A.    Not that I'm aware of.

18 BY MS. LUSK:

19      Q.    Has anyone ever informed IDOC that inmates

20 have complained that they don't receive final

21 determinations on grievances through the institutional

22 mail?

23           MR. KARABETSOS:  Same objection, beyond --

24 beyond the scope of this witness' topic.

ADAM FRIESE
August 14, 2023

 1          Go ahead, Mr. Friese.

 2          A.    Not that I'm aware of.

 3     BY MS. LUSK:

 4          Q.    How soon after a grievance officer

 5     receives a CAO's determination is the grievance sent

 6     back to inmate through institutional mail?

 7          A.    So once it's received back, it's logged,

 8     and then once it's logged, it's sent back to them, so

 9     it just depends on how long it takes, you know, them to

10     -- if they receive it back the next day, then it's

11     logged and sent back to them that day.

12          Q.    How long does it take for something sent

13     via institutional mail to get to an inmate?

14          A.    Are you asking how long it takes them to

15     get institutional mail?

16          Q.    Yes.

17          A.    I mean institutional mail is passed out I

18     believe it's Monday through Saturday, so it just

19     depends on how long it takes -- I mean it goes to the

20     mailroom, the mailroom assigns it to the appropriate

21     house, and then it's passed out.  So it just depends on

22     how long it takes that staff to, you know, get it to

23     them.

24          Q.    How many times a day is institutional mail

ADAM FRIESE
August 14, 2023

 1          A.    Because there's a stamp on there.

 2          Q.    When are grievances stamped?

 3          A.    When they've been received for the first

 4   time.

 5          Q.    Who stamps a grievance?

 6          A.    Our office associate or whoever is working

 7   in that capacity at the time.

 8          Q.    Are grievances always stamped when they're

 9   received?

10          A.    Unless they're -- so whenever they're

11   logged, they're stamped, yes.  If they're received and,

12   you know, the wrong way, whether it's through

13   institutional mail, they're not stamped, but if they're

14   received the proper way through the grievance box, they

15   are stamped, yes.

16          Q.    And what -- what level of review or what

17   -- what type of grievance was this categorized as?

18          A.    Medical.

19          Q.    And so what level of review did it go

20   through initially?

21          A.    It would go to second level.

22          Q.    And -- and that means it would be sent

23   directly to the health care unit; is that correct?

24          A.    Correct.

ADAM FRIESE
August 14, 2023

1        Q.    So based on what we talked about earlier,

2    is -- is my understanding correct that this would have

3    gone to Miss Chacon and she would have evaluated it?

4        A.    If she was the health care administrator

5    on, you know, at that time.  I'm not sure exactly when

6    she started, but, yes, if she was the administrator,

7    they would go to her.

8        Q.    Okay.  Or whoever was in that role?

9        A.    Yes.

10       Q.    So a counselor did not review this

11   grievance?

12       A.    Not at the first level.  The second level

13   -- once we get the response from the health care, it's

14   then sent back to our office, and the counselor is the

15   one that actually puts it on the second level form.

16       Q.    Okay.  But they don't go through any kind

17   of substantive review?

18       A.    No.  We just put the response that is --

19   that we received from the health care department.

20       Q.    Okay.  Let's put up another exhibit.  This

21   is going to be IDOC000427.  Mr. Friese, take a moment

22   to review this and let me know when you're done.

23       A.    Yep.  I know what it is.

24       Q.    Okay.  And which grievance officer

ADAM FRIESE
August 14, 2023

1    reviewed this grievance?

2         A.    At the time, it was Counselor Petersen.

3         Q.    Was he a -- he was a counselor at that

4    time or he was a grievance officer?

5         A.    Well, the -- the grievance officers are

6    counselors.  I'm -- you know, we are counselors, but he

7    was a grievance officer, yes.

8         Q.    Okay.  Is there a separate role -- like is

9    -- is there a separate position within IDOC that's just

10   counselor?

11        A.    We have counselors, and then as an

12   assignment, you are assigned to the grievance office as

13   a grievance, you know, counselor, grievance officer.

14        Q.    Okay.  So any counselor that reviews a

15   grievance is also designated as a grievance officer?

16        A.    No.  Only at certain times are you

17   determined to be a grievance counselor, grievance

18   officer.

19        Q.    Okay.  Does anyone that's not designated a

20   grievance officer or grievance counselor review

21   grievances?

22        A.    Grievance counselors review them and then

23   they assign to the counselors, you know, the

24   appropriate counselor.  For level two grievances, it's

ADAM FRIESE
August 14, 2023

1   the grievance officer that -- that reviews them.

2        Q.    Okay.  So -- so Mr. Petersen is the one

3   who filled out this grievance officer's report for

4   Grievance 4012?

5        A.    Yes.

6        Q.    And when did he review the grievance?

7        A.    It looks like it says 7/27 of '20.

8        Q.    And --

9        A.    Or I'm sorry.  That was the date received.

10  The date of review was 8/18 of '20.

11       Q.    Okay.  And is my understanding correct

12  that because this initially went to the health care

13  unit and it looks like Miss Chacon reviewed it, that

14  Mr. Petersen did not independently investigate the

15  substance of this grievance?

16       A.    No.

17       Q.    So he just deferred to what Miss Chacon's

18  assessment was, correct?

19       A.    Yes.

20       Q.    So after Mr. Petersen received this, Miss

21  Chacon's response, he filled out this report.  What did

22  he do next with this grievance?

23       A.    It would have then been sent to the CAO

24  for determination.

ADAM FRIESE
August 14, 2023

1          Q.    Okay.  And what did the CAO determine?

2          A.    She concurred.  Whoever the -- I can't see

3     the name on there, but whoever it was concurred with

4     the -- with Mr. Petersen's response.

5          Q.    Do you know why CAO Larson concurred?

6          A.    I do not.

7          Q.    Do you know what CAO Larson did, or I

8     think that says Kim Larson, but we'll just say the CAO

9     in this case, do you know what the CAO did as part of

10    their review of this grievance?

11         A.    I would assume she read the grievance and

12    the response and then she made her determination.

13         Q.    But you don't know specifically?

14         A.    No.

15         Q.    You don't know if she talked to anyone as

16    part of her review of this grievance?

17         A.    No.

18         Q.    You don't know if she reviewed any other

19    documents besides the grievance officer's report?

20         A.    No.

21         Q.    After the CAO rendered their

22    determination, what happened to this grievance?

23         A.    It would have been sent back to the

24    grievance office to be logged that it was completed at

ADAM FRIESE
August 14, 2023

1  the second level and then returned to the individual.

2        Q.    And how is this returned to Mr. Hudson?

3        A.    Through the institutional mail.

4        Q.    Did IDOC do anything to confirm that Mr.

5  Hudson did in fact receive this through institutional

6  mail?

7        A.    No.

8        Q.    So IDOC doesn't know one way or the other

9  whether Mr. Hudson ever received the response to this

10 grievance?

11       A.    No.

12       Q.    Does IDOC know what date it put this

13 grievance in institutional mail?

14       A.    It would have been -- there would have

15 been a Champ entry saying that it was completed at the

16 -- you know, determined, whatever, by the CAO, that

17 they concurred with it, so that Champ note would have

18 been made, and then it would have been sent back that

19 date.

20       Q.    But does IDOC know for certain that it was

21 in fact put in institutional mail on the Champ note

22 date?

23       A.    It would be in the Champ log for him.

24       Q.    Right.  I understand it's in the log, but

ADAM FRIESE
August 14, 2023

1  does IDOC know for certain that -- that it was actually

2  put in the mail?

3      A.    No.

4      Q.    Okay.  Let's take that exhibit down, and

5  we're going to put up another exhibit.  This is

6  IDOC000423, and this will be our Exhibit 5.

7      Mr. Friese, take a moment to review this and let

8  me know when you're ready.

9      A.    Okay.

10     Q.    Are you familiar with this document?

11     A.    Yes.  It's an individual in custody

12  grievance.

13     Q.    This is a grievance from John Hudson dated

14  August 9th, 2020; is that accurate?

15     A.    Yes.

16     Q.    And when did IDOC receive this grievance?

17     A.    August -- the -- the -- looks like August

18  11th.  The print is real small.

19     Q.    Okay.  And what type of grievance is this?

20     A.    A medical grievance.

21     Q.    So this went directly to second level

22  review; is that fair?

23     A.    Yes.

24     Q.    And it looks like Miss Chacon also did

ADAM FRIESE
August 14, 2023

1  that initial second level review?

2       A.    Yes.

3       Q.    And after Miss Chacon completed her

4  review, what did she do with this grievance?

5       A.    What did Miss Chacon do with the

6  grievance?

7       Q.    Yes.

8       A.    She would have sent it to the grievance

9  office.

10      Q.    Okay.  Let's put up another exhibit.  This

11 is IDOC000421, and this will be our Exhibit 6.

12      Okay.  Take a moment to review this and let me

13 know when you're ready.

14      A.    I'm ready.

15      Q.    Okay.  Are you familiar with this

16 document?

17      A.    Yes.  It's a second level grievance form.

18      Q.    And is it the -- the grievance report of

19 Mr. Hudson's Grievance No. 4104?

20      A.    Yes.

21      Q.    And this is the report to the grievance we

22 just looked at that he submitted on August 9th, 2020?

23      A.    Yes.

24      Q.    And who responded to this, or which

ADAM FRIESE
August 14, 2023

1   grievance officer filled out this report?

2          A.    The Counselor Robert Luecke.

3          Q.    And we talked about how this was also sent

4   to the health care unit, and Miss Chacon made this

5   assessment, right?

6          A.    Yes.

7          Q.    So in filling out this form, Mr. Luecke

8   deferred to Miss Chacon's assessment of the grievance;

9   is that accurate?

10         A.    Yes.

11         Q.    Mr. Luecke did not do any further

12  substantive review of the grievance?

13         A.    Not that I'm aware of.

14         Q.    After Mr. Luecke filled out the form

15  giving the recommendation on this grievance, what

16  happened to this grievance?

17         A.    It was then sent to the CAO for

18  determination.

19         Q.    Okay.  And when was that?

20         A.    On 9/15 of 2020.

21         Q.    And what did the CAO do as part of their

22  review of this grievance?

23         A.    She concurred with the second level

24  response.

ADAM FRIESE
August 14, 2023

1       Q.    Do you know why she concurred?

2       A.    I do not.

3       Q.    Do you know what steps she took as part of

4   her review of this grievance?

5       A.    No.

6       Q.    Do you know whether she spoke to anyone

7   about this grievance?

8       A.    No.

9       Q.    Do you know whether she reviewed any

10  documents beyond this grievance officer's report?

11      A.    No.

12      Q.    After the CAO completed her review, what

13  happened next to this grievance?

14      A.    It was then returned to the grievance

15  office, logged in Champ and then sent to the individual

16  through the institutional mail.

17      Q.    Do you know what date this was placed in

18  institutional mail?

19      A.    Not without reviewing the -- the log, the

20  Champ log.

21      Q.    But the Champ log would be the only basis

22  for that knowledge?

23      A.    Yes.

24            MS. LUSK:  Dimitrios, if you want to take

ADAM FRIESE
August 14, 2023

1       Q.    And then I believe there's one more page

2   at the bottom.  For completeness, let's just scroll

3   down to that so you can see the full document.

4       A.    Okay.

5       Q.    Okay.  So are you familiar with this

6   document?

7       A.    Yes.

8       Q.    And what is this document?

9       A.    It's the response from the Administrative

10   Review Board to Grievance 4104.

11       Q.    Okay.  And that's the grievance we were

12   just looking at, correct?

13       A.    Yes.

14       Q.    And what was the ARB determination of this

15   grievance?

16       A.    They did not give a response.  It was sent

17   to them past the 30 day that they have to appeal a

18   decision.

19       Q.    So they didn't substantively review it

20   because they did not timely receive it?

21       A.    Yeah.  They -- they saw that it had been

22   past the 30-day review point, so that was their

23   response, was that it was outside the 30-day time

24   frame.

ADAM FRIESE
August 14, 2023

1    Q.    Okay.  Let's go to the second page of this

2    document, and scroll down so we can see the bottom,

3    offender's appeal to the director.  Do you see that,

4    Mr. Friese?

5    A.    Yes.

6    Q.    It is signed by Mr. Hudson and dated

7    September 20th, 2020.  Do you see that?

8    A.    Yes.

9    Q.    Does IDOC have any basis to doubt that Mr.

10   Hudson signed the grievance officer's report on

11   September 20th, 2020?

12   A.    No.

13   Q.    Does IDOC know what day Mr. Hudson placed

14   his appeal of this grievance in the institutional -- or

15   pardon me -- the -- the designated box at Danville

16   Correctional Center for outgoing mail?

17   A.    No.

18   Q.    So you don't know one way or the other

19   what date he submitted that?

20   A.    I mean I would assume it was on 9/20 of

21   '20 because that's the day he signed it, but I don't

22   know that for sure.

23   Q.    Okay.  Does IDOC know what date IDOC

24   personnel would have collected Mr. Hudson's appeal from

ADAM FRIESE
August 14, 2023

1   that designated mailbox?

2        A.    No.

3        Q.    And does IDOC know what date IDOC

4   personnel gave Mr. Hudson's appeal to USPS, United

5   States Postal Service?

6        A.    Again, I don't work in the mailroom, so I

7   don't know that.

8        Q.    Okay.  Does IDOC know what date Mr.

9   Hudson's appeal was delivered to the ARB?

10       A.    December 31st is when they received it,

11  December 31st of 2020.

12       Q.    And how do you know that?

13       A.    It's stamped on the form there.

14       Q.    Does the ARB still have the envelope that

15  this appeal was delivered to it in?

16       A.    I don't know.  I don't work at the ARB.

17             MS. LUSK:  All right.  Let's take a brief

18  five-minute break so I can review my notes.

19             THE VIDEOGRAPHER:  Going off the record.

20  The time is 16:15 UTC.

21                  (Break was taken.)

22             THE VIDEOGRAPHER:  We are back on the

23  record.  The time is 16:20 UTC.  Please proceed.

24  BY MS. LUSK:

ADAM FRIESE
August 14, 2023

1  contact about the grievance identified in your

2  deposition today as Exhibit 5 and dated August 9th,

3  2020?

4           A.    Yes.

5           Q.    And did your contact at the ARB indicate

6  whether that -- when that was -- that grievance was

7  received or that appeal grievance was received at the

8  ARB?

9           A.    Yes.  December 31st.  December 31st of

10  2020.

11          Q.    So in addition to the stamp on that

12  document, Exhibit 6, you were also orally told by an

13  employee at the Administrative Review Board that that

14  grievance was received on December 31st, 2020?

15          A.    Yes.

16          Q.    Does the Illinois Department of

17  Corrections have any reason to believe that the

18  Administrative Review Board received Mr. Hudson's

19  appeal of his August 9th, 2020 dated grievance at any

20  time other than December 31st, 2020?

21          A.    No.

22          Q.    Does the Illinois Department of

23  Corrections have any indication whatsoever that

24  Plaintiff John Hudson ever submitted his appeal of the

ADAM FRIESE
August 14, 2023

1  August 9, 2020 grievance on September 20th, 2020?

2       A.   Can you say that again?

3       Q.   Sure.  Let me -- no.  That's fine.  Just

4  one second, please.

5       Let me go back to the Champs cumulative

6  counseling summary discussion we had earlier.  At any

7  -- at every point in the process at Danville Community

8  College -- Community College -- sorry, strike that --

9  Danville Correctional Center, when a counselor makes a

10 decision, when a grievance officer makes a decision,

11 that is communicated to the offender; is that correct?

12      A.   Yes.  Every time the -- a grievance is

13 either received or there's been an answer, whether it's

14 first level, second level, there's a Champ note entered

15 and sent to the individual.

16      Q.   And it's always sent by institutional mail

17 to the offender?

18      A.   Yes.

19      Q.   Are there any circumstances when they are

20 not -- when the offender is not informed about the

21 receipt of a grievance or of a decision on a grievance?

22      A.   No.  Every time it's received or answered,

23 it's -- a Champ entry is made and then sent to the

24 individual through the mail.

ADAM FRIESE
August 14, 2023

1        Q.    And prior to this deposition, you inquired

2   about a -- a grievance dated July 25th, 2020; is that

3   correct?

4        A.    Yes.

5        Q.    And that was previously marked as Exhibit

6   4 today.  Do you recall that?

7        A.    Yes.

8        Q.    Does the Illinois Department of

9   Corrections have any reason or any indication that that

10  grievance was ever appealed to the Administrative

11  Review Board?

12       A.    No.

13            MR. SIEVERS:  I need just -- we can go off

14  the record for about five minutes.  We'll take a break

15  for about five minutes and come back.

16            MS. LUSK:  That's fine.  Yeah.

17            MR. SIEVERS:  Great.  Thank you.

18            THE VIDEOGRAPHER:  Going off the record.

19  The time is 16:49 UTC.

20                 (Break was taken.)

21            THE VIDEOGRAPHER:  We are back on the

22  record.  The time is 16:55 UTC.  Please proceed.

23            MR. SIEVERS:  Counsel, could you be so

24  kind to pull up Exhibit 5 that you referenced earlier.

ADAM FRIESE
August 14, 2023

1  the ARB received that appeal was based on?

2      A.    Are you talking about Mr. Kilduff?

3      Q.    Yes.

4      A.    I'm assuming he was looking at the -- he

5  was looking at his file when I spoke to him, so I'm

6  assuming he had that document that was from the

7  Administrative Review Board with that December 31st,

8  2020 stamp on it.

9      Q.    You don't know if his knowledge was based

10 on anything besides that document?

11     A.    No, because that's what he was looking at.

12     Q.    Yeah, but you -- you didn't ask him if it

13 was based on any knowledge besides that document?

14     A.    No.

15     Q.    Okay.  We talked earlier about relief

16 inmates can receive for medical grievances.  Do you

17 recall that?

18     A.    Yes.

19     Q.    I think you said it's possible they can be

20 granted relief depending on the grievance?

21     A.    Right.

22     Q.    Is IDOC aware --

23         MR. SIEVERS:  I'm going to object.  This

24 is beyond the scope of -- of my examination.

ADAM FRIESE
August 14, 2023

```
 1                    MS. LUSK:  Okay.

 2                    MR. SIEVERS:  This is just re-examination.

 3    BY MS. LUSK:

 4         Q.   Is IDOC aware of any relief that has been

 5    granted for a medical grievance specifically?

 6                    MR. KARABETSOS:  I'm going to object to

 7    that, beyond the scope.

 8         You can answer.

 9         A.   As far as are they -- did he receive any

10    relief; is that what you're asking?

11    BY MS. LUSK:

12         Q.   For a medical grievance in general, is

13    IDOC aware of any relief that's ever been granted for a

14    medical grievance?

15                    MR. KARABETSOS:  That's certainly beyond

16    the scope.  Objection.

17         You can answer, Mr. Friese.

18         A.   I -- I don't know for any med -- I mean

19    there's a lot of medical grievances, so I -- I don't

20    know that.

21                    MS. LUSK:  Okay.  I have nothing further.

22                       CROSS-EXAMINATION

23    BY MR. KARABETSOS:

24         Q.   I just have a couple of questions and I
```

ADAM FRIESE
August 14, 2023

1   won't take long, Mr. Friese.  I just want to ask you a

2   few questions about your preparation for today.

3        A.    Okay.

4        Q.    You said there's three counselors working

5   at Danville Correctional Center; is that right?

6   There's three grievance officers?

7        A.    Yes.

8        Q.    Okay.  And then can you tell me -- I know

9   it probably changes every day, but can you just tell me

10  generally how many grievances come into the grievance

11  office on a daily basis?

12       A.    I picked up half the grievances this

13  morning, and I had like 37, I believe, for just my

14  half, so I don't know -- I haven't been over the

15  grievance office's, you know, to see what the other

16  half is, but, generally, on a regular basis, I would

17  say it ranges from -- anywhere from 20 to 40 a day.

18       Q.    Okay.  And -- and the ARB receives appeals

19  from inmates on their grievance responses.  They

20  receive those appeals from inmates at every IDOC

21  correctional center; is that correct?

22       A.    Yes.

23       Q.    Okay.  The grievances that you were asked

24  about today are -- you know, the alleged dates here are

1                    REPORTER'S CERTIFICATE

2

3            I, Tami L. Bruder, a Registered Professional
Reporter and a Certified Shorthand Reporter in the
4    State of Illinois, do hereby certify:

5            That prior to being examined, the witness in
the foregoing proceedings was by me duly sworn to
6    testify to the truth, the whole truth, and nothing but
the truth;

7

8            That said proceedings were taken remotely
before me at the time and places therein set forth and
were taken down by me in shorthand and thereafter
9    transcribed into typewriting by me, and that this
deposition is a true and accurate record of the
10   testimony given by the witness;

11           I further certify that I am neither counsel
for, nor related to, any party to said proceedings, not
12   in anywise interested in the outcome thereof.

13           In witness whereof, I have hereunto
subscribed my name.

14
Dated:  August 17, 2023

15

16   _Tami L Bruder-Ksioszke_

17

18   Tami L. Bruder
     CSR No. 084.004804

19

20

21

22

23

24