IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

JOHN HUDSON,                      )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )          21-cv-2056
                                 )
JONATHAN EK, and others,         )
                                 )
          Defendants.            )

**ORDER**

Plaintiff brought this suit pursuant to 28 U.S.C. § 1983 alleging deliberate indifference to his serious medical needs in violation of his Eighth Amendment rights.

Defendants contend that Plaintiff failed to exhaust his administrative remedies, as required by the Prison Litigation Reform Act, prior to filing suit. The Court entered an Order (Doc. 126) finding issues of material fact existed as to whether Plaintiff had exhausted his available administrative remedies.

On September 14, 2023, the Court conducted an evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008), to resolve factual disputes as to whether Plaintiff exhausted his available administrative remedies prior to filing this lawsuit. The Court allowed additional limited discovery to develop facts related to

1

issues raised at hearing. Plaintiff filed his Proposed Findings of Fact (Doc. 162) and Defendants filed their Proposed Findings of Fact (Doc. 163) on November 17, 2023. The Court heard closing arguments on January 16, 2024.

Also before the Court is Plaintiff's Motion for Reconsideration (Doc. 139) asking the Court to reconsider certain rulings in Summary Judgment Order (Doc. 126) and to determine that Plaintiff did not have available administrative remedies due to 1) prison officials' failure to respond to the relevant portion of Plaintiff's Grievance 4012, and 2) IDOC's failure to substantively review Plaintiff's medical grievances. Defendants filed a Response (Doc. 143).

As discussed below, the Court now finds Defendants have not carried their burden to prove Plaintiff failed to exhaust his available administrative remedies.

**A. <u>Facts</u>**

**<u>Facts Common to All Grievances at Issue</u>**

**<u>Plaintiff's testimony.</u>** Plaintiff testified that he is serving a sentence on a felony conviction, has been an IDOC inmate since 1999, is currently housed at Danville Correctional Center and has

been since 2019, and has been housed at various other IDOC facilities prior to Danville. Hearing Transcript, (Doc. 150 at 19:23–20:13).

Plaintiff understands that if he has issues in prison, he can submit grievances; he knows how to obtain grievance forms at Danville, knows how to fill them out, and knows where to put the completed forms to submit them. (Doc. 150 at 20:18–21:3).

Plaintiff has typically had a Correctional Counselor throughout his incarceration and understands that the Counselor is the first level of review for a non-emergency grievance. (Doc. 150 at 21:7–14). Plaintiff received a handbook at Danville explaining the grievance process. (Doc. 150 at 21:15–18). When the facility was not on lockdown, if Plaintiff wanted to submit a grievance, he would complete the form and put it in a box in his housing unit; if the facility was on lockdown he could submit grievances by placing the grievance in his cell's door and an officer would pick up the grievance and put it in the grievance box. (Doc. 150 at 21:19–22:12). Plaintiff sometimes hand writes grievances and sometimes writes them on a typewriter; he will typically copy – either by hand or on his typewriter – each grievance he submits and retain the

3

copy; he keeps the copies in a folder; his practice is to write "cc:
John Hudson" on grievances that he copies though he does not
always do so; he also occasionally sends copies of grievances to his
family or attorneys and will indicate who he sent a copy to on the
grievance. (Doc. 150 at 23:8–25:11).

Plaintiff testified that prior to filing this lawsuit he submitted
three grievances related to his thumb issues. (Doc. 150 at 59:23-
60:16). He testified the dates of the grievances he submitted were
February 16, July 25, and August 9, 2020. (Doc. 150 at 60:13-16).

**Michael Mason's testimony.** Michael Mason was Plaintiff's
cellmate at Danville Correctional Center in 2020. (Doc. 150 at
149:24-25; 150:8-9). Mason was unsure exactly when in 2020 he
was Plaintiff's cellmate, testifying he was cellmates with Plaintiff
from "at least January all the way up to August," but was unable to
provide further precision as to exact dates. (Doc. 150 at 158:10-
159:19). Mason is familiar with prison grievances and filed over 100
grievances while he was in prison, including while he was in prison
at Danville. (Doc. 150 at 150:14-151:3).

Mason testified that the grievance process involved obtaining a
grievance form, writing in the complaint that he wanted addressed,

4

signing the document, and placing it in the grievance box in his housing unit, or, during lockdown, placing the completed form in his cell door for staff to pick up or placing the completed form in a grievance box brought around by a correctional counselor. (Doc. 150 at 151:1-152:12). Mason testified that next, a counselor was supposed to review the grievance and return it to the inmate with a written response via institutional mail. (Doc. 150 at 152:18-153:2). He testified that grievance returns are not documented by any record or receipt at the time returned. (Doc. 150 at 153:10-12). He testified that there were times he submitted grievances at Danville and did not receive a response back from a counselor and that he does not know what occurred to cause the lack of response. (Doc. 150 at 153:13-18). If he did receive a response, he then put the grievance back in the grievance box for review in the grievance office. (Doc. 150 at 153:19-23). Grievance officers next reviewed the grievance and documented the review on their own form, which was then reviewed by the Warden for final determination. (Doc. 150 at154:1-13). Mason testified that he did not always receive a final determination, including while he was at Danville, and that in that situation all he could do was consult with a correctional counselor,

5

which was not generally helpful. (Doc. 150 at 154:22-155:15). Mason agreed that he had on at least one occasion received a final determination on a grievance he had filed while at Danville. (Doc. 150 at 161:1-162:1).

Mason testified that during 2020, he personally observed Plaintiff prepare grievances including medical grievances. (Doc. 150 at 155:16-23). Mason did not review any of Plaintiff's grievances in preparation for his testimony and was unsure exactly how many grievances Plaintiff had filed. (Doc. 150 at 160:11-20). Plaintiff let Mason review grievances Plaintiff had written. (Doc. 150 at 156:1-2). Mason knows Plaintiff filed medical grievances in 2020 related to a painful bump on Plaintiff's thumb, seeking medication and a referral to have the thumb examined at an outside hospital. (Doc. 150 at 156:3-13). Mason also knew Plaintiff to have filed grievances regarding magazines and mail that he did not receive. (Doc. 150 at 160:4-10).

Mason personally observed Plaintiff submitting grievances into the grievance box and submitting grievances during lockdown. (Doc. 150 at 156:14-21). Mason personally observed Plaintiff encounter problems with his grievances, including observing

6

Plaintiff speaking with the counselor from their shared cell about not receiving back grievances that he had submitted. (Doc. 150 at 156:22-157:7).

Mason observed Plaintiff talking to counselors when he got the chance, regarding his grievances and trying to understand why he could not get assistance for his thumb issue. (Doc. 150 at 157:8-22).

**Jennifer Vollen-Katz.** Ms. Vollen-Katz is the Executive Director at the John Howard Association, an independent, non-partisan, not-for-profit, citizen correctional oversight group that monitors the conditions of confinement in Illinois prisons. (Doc. 150 at 164:13-19). She has been at the Association for almost 12 years and in her current role oversees programmatic work and all administrative aspects of the organization. (Doc. 150 at 164:20-165:2). The Association collects information regarding Illinois prisons by touring prisons, communicating with persons who are incarcerated, and conducting surveys of persons in prison. (Doc. 150 at 166:8-168:16). The Association has received information, "over the years," that persons in Illinois prisons "lack faith in the grievance system," the system is "broken," that they have not

received responses, that mail is slow and "things aren't getting where they need to go," that grievances have "disappeared," and "things along those lines." (Doc. 150 at 174:9-19).

Regarding mail, the Association performed a test at Dixon Correctional Center. (Doc. 150 at 177:8-20). The Association wrote "test" on a piece of mail addressed to the Association while on a monitoring visit at Dixon in October 2022 and did not receive that piece of mail until January 2023. *Id.* The Association has not conducted a similar test at Danville. (Doc. 150 at 192:18-20).

Ms. Vollen-Katz did not speak with any grievance officers, or anyone working at the Administrative Review Board, regarding preparation of the Association's reports. (Doc. 150 at 190). Various Association reports include the disclaimer that the Association "is not able to substantiate much of the information shared. We have consolidated information received and share it as an anecdotal resource only," and regarding survey data and comments, those represent simply unsubstantiated transcription of comments received from persons in prison. (Doc. 150 at 190:22-192:1). No one from the Association was present at Danville Correctional Center at

any point in 2020, and no one from the Association has any personal knowledge of Plaintiff's grievances. (Doc. 150 at 192:2-12).

**<u>Sharon Hansen.</u>** Sharon Hansen previously worked for IDOC as an Office Assistant, Mailroom Supervisor, and Correctional Counselor. She was a Correctional Counselor at Danville beginning in November 2018. (Doc. 150 at 81:3-21). Hansen retired in 2021. (Doc. 150 at 85:22-86:1). Her case load as a counselor was approximately 400 inmates if the prison was at full capacity. (Doc. 150 at 96:12-21).

Correctional Counselors do a lot of paperwork, receive grievances, recommend offenders for jobs, complete transfer paperwork, and generally act as an intermediary between the inmate and prison management. (Doc. 150 at 82:7-11). Counselors keep track of visits with inmates on a system called CHAMPS. (Doc. 150 at 82:19-23). After seeing an individual, if there were an issue Hansen needed to follow up on or take notes on, Hansen wrote the concerns on a notepad and after seeing all offenders logged these notes into CHAMPS. (Doc. 150 at 83:2-13).

Hansen worked with Adam Friese, who was also a correctional counselor, and was not surprised to hear that Friese testified that

the inmate population at Danville submitted between 40 and 80 grievances per day. (Doc. 150 at 97:17-98:3).

Hansen was assigned to be Plaintiff's counselor in March 2020, and testified that it was her practice to document "any request or questions" received from inmates that she met with, including questions about the status of grievances. (Doc. 150 at 87-88).

Hansen had a role in responding to grievances. If a grievance was related to an issue other than a medical issue, she handled the grievance directly. (Doc. 150 at 84:9-18). Medical grievances were handled differently; grievance officers forwarded medical grievances directly to the Healthcare Unit to be addressed by a person unknown to Hansen. (Doc. 150 at 84:19-85:4).

Hansen could look at an inmate's CHAMPS log and see at what level of review grievances were. (Doc. 150 at 84:5-12). Hansen testified the CHAMPS log should contain an entry for every step a grievance takes, including determinations as to emergency status. (Doc. 150 at 83:19-84:8; 115:13-116:2).

Asked whether she recalled Plaintiff, Hansen testified she looked up Plaintiff on IDOC's website upon receiving a notice to

10

appear for this case to "kind of get an idea who I was dealing with," and upon viewing Plaintiff's photograph on that website found Plaintiff "looked familiar." (Doc. 150 at 85:14-21). She does not recall any specific conversations with Plaintiff. (Doc. 150 at 94:19-95:11).

Hansen testified that finalized grievances are returned to inmates through the institutional mail. (Doc. 150 at 93:16-19).

**Missing CHAMPS log entries.** Plaintiff's CHAMPS log is missing various entries. (Doc. 162-2 at ¶ 5-7).

### Facts Specific to the February 16, 2020, Grievance

### Plaintiff's testimony.

Plaintiff testified that his February 16, 2020, grievance was about neuropathy in his eye and a cyst on his thumb that caused extreme pain. (Doc. 150 at 60:17-25). Plaintiff was seeking pain medication and "trying to get help" from Dr. Young in the form of a referral to an outside specialist for his thumb. (Doc. 150 at 61:6-15).

Plaintiff testified that he was "positive" that he had prepared and submitted this grievance. (Doc. 150 at 65:9-12). Plaintiff made a copy of the February 16 grievance, introduced as Plaintiff's

11

Exhibit 1. (Doc. 150 at 61:16-22). Plaintiff testified that if he "CC'd" himself on a grievance he had submitted, he wrote CC John Hudson on the original, and sometimes on the copy. (Doc. 150 at 63:1-10).

Plaintiff testified that after writing the grievance on February 16, 2020, he submitted the grievance by either 1) if the prison was on lockdown, he let an officer put the grievance in the grievance box, or 2) if the prison was not on lockdown, he put the grievance in the grievance box himself. (Doc. 150 at 63:13-20).

Plaintiff does not recall receiving confirmation that the grievance was received, which he did not find unusual because medical grievances can take "a while" to receive a response. (Doc. 150 at 63:24-65:7). Plaintiff testified that sometime after he submitted the grievance, he asked counselor Sharon Hansen about the status of the grievance and was told that it was being processed. (Doc. 150 at 64:8-65:5). Plaintiff never received a grievance office report regarding the February 16 grievance. (Doc. 150 at 65:6-8).

**<u>Lack of contradictory testimony.</u>** No witness with personal knowledge testified to contradict Plaintiff's testimony that he had submitted the February 16, 2020 grievance on February 16, 2020.

**<u>Sharon Hansen.</u>** Hansen confirmed that Plaintiff's Exhibit 1 is a grievance signed and dated February 16, 2020 and that the form used is the form in effect at Danville as of January 2020. (Doc. 150 at 100:1-23).

Asked if she understood that Plaintiff contends he submitted this grievance on February 16, 2020, Hansen responded, "No. It has not been submitted. It has not – the proper affixation on here that say it's never been submitted." (Doc. 150 at 100:24-101:25). Asked again whether she understood that Plaintiff contends he submitted it on February 16, 2020, Hansen testified "I understand he says he submitted it, but I'm saying it has not been officially … The Offender did not submit this to the grievance office. It does not have the proper designations, date stamps. It has not been given a grievance number." (Doc. 150 at 101:6-16). However, Hansen concedes that she does not see offender's mail, does not see grievances in the grievance box, and does not personally see offenders place grievances in the grievance mailbox, except

13

occasionally during times when she collected grievances for the entire housing unit during quarantine. (Doc. 150 at 101:18-103:1).

Hansen testified that Plaintiff's CHAMPS summary does not include a notation regarding Plaintiff enquiring about a grievance submitted February 16, 2020, nor does Plaintiff's CHAMPS summary indicate that a grievance dated February 16, 2020, was received by the grievance office. (Doc. 150 at 89:1-25). The CHAMPS log does show Grievance Number 4012 was received on July 27, 2020, and Hansen would expect a similar entry for the February 16 grievance. (Doc. 150 at 90:6-20).

If an inmate asked her about a grievance to which a response was not received, she "most likely" logged into CHAMPS to review the summary. (Doc. 150 at 91:25-92:7).

**Facts Specific to July 25, 2020, Grievance**

Plaintiff testified that in July 2020, the pain and swelling in his thumb were worsening. (Doc. 150 at 65:13-66:3). On July 25, Plaintiff wrote and submitted a grievance, Grievance 4012, complaining about several issues, including the pain in his thumb, his desire for pain medication, and his desire for a specialist referral. (Doc. 162-10; Doc. 150 at 65:13-67:12). On about August

14

12, 2020, the Health Care Unit Administrator (HCUA) Jennifer Chacon filled out her response to Grievance 4012 and signed the grievance, stating, "per patient chart review, Dr. Ek wrote a note on 7/23/20 that 'gabapentin is NOT indicated for glaucoma treatment.' Dr. Ek ordered an alternative treatment for pain/congestion. Please use NSC procedures if pain continues." (Doc. 162-10).

Ms. Chacon testified at her deposition that she had been at IDOC for two months at the time she responded to Grievance 4012, that she was instructed to respond to all complaints in a grievance, that, if she neglected to answer something, the response was returned to her for further elaboration, and that she "did neglect to address the thumb issue, so there is no response" as to Grievance 4012. (Doc. 162-11 (Chacon deposition) at 38:1-41:4).

The HCUA is not a licensed physician or nurse practitioner; she cannot diagnose patients, order diagnostics, prescribe medication, or prescribe medical permits; she responds to medical grievances by referring to a patient's medical records and ensuring that he is receiving some care; she did not second-guess anything she saw in Plaintiff's medical records, nor did she consult with

anyone for assistance in performing substantive review of the care Plaintiff was receiving. (Doc. 162-11 at 68-69).

ARB Chairman Clayton Stephenson confirmed that if an inmate mentions more than one issue in a grievance, IDOC officials should respond to every issue, but that failure to respond to one issue does not render an issue moot, and instead a partially-responded-to grievance, if properly appealed to the ARB, will be investigated by the ARB or returned to the grievance officer for additional response. (Doc. 150 at 134:10-135:16).

On about August 18, 2020, Grievance Officer John Petersen signed the grievance officer's report for Grievance 4012. (Doc. 162-12). Danville's Chief Administrative Officer concurred with Petersen's recommendation that same day. *Id.* Petersen's recommendation for resolution restated verbatim HCUA Chacon's response. *Id.* IDOC agrees that Petersen did not substantively review the grievance or the HCUA response. (Doc. 162-9 (Friese deposition) at 76:2-19).

Plaintiff's CHAMPS log includes an entry on August 19, 2020, stating that the final determination was returned to Plaintiff that day. (Doc. 162-13 at IDOC_000683). According to IDOC, the return

16

date on the CHAMPS log only shows the date the final grievance
determination is asserted to have been placed in the institutional
mail, rather than documentation of personal delivery to an inmate.
(Doc. 162-9 at 78:2-79:3). IDOC does not know that the final
determination as to Grievance 4012 was in fact placed in the
institutional mail or whether it was in fact returned to Plaintiff. *Id.*

IDOC could institute processes to ensure final grievance
determinations are received by inmates, including delivery by
correctional counselors, requiring inmates sign for receipt of
grievance determinations, or both; however, IDOC does not have
any procedure to affirmatively ensure that final grievance decisions
are given to inmates, nor does it maintain any records showing that
inmates received final grievance determinations. (Doc. 162-5 at
52:1-10).

Plaintiff confirmed that he has no written documentation
indicating that he complained, in 2020, about not receiving a
response to Grievance 4012. (Doc. 150 at 39:15-18; 40:3-7; 40:25-
41:1-4). Plaintiff testified that he is "positive" he never received the
final determination regarding Grievance 4012 because he was in
bad pain, he was trying to get help, and he would have appealed the

17

determination to the ARB had he received it. (Doc. 150 at 69:3-70:6). Defendants did not present testimony by anyone with personal knowledge to rebut Plaintiff's testimony that he had not received the final determination regarding Grievance 4012.

Defendants asked Plaintiff about a version of Grievance 4012 that states only "refer to healthcare" on it and does not include the HCUA's response. (Doc. 150 at 34:2-37:20; Defendants' Hearing Exhibit 8 (Doc. 73-3 at 62)). Plaintiff testified that he received this document in discovery and sent it back to his attorneys along with medical records. The Court notes that, whatever the provenance of Defendants' Hearing Exhibit 8, it is not a completed grievance determination that could have been appealed to a grievance officer. Compare (Doc. 73-3 at 62) and (Doc. 73-3 at 64).

### Facts Related to August 9, 2020, Grievance

In August 2020, Plaintiff's pain and swelling from the cyst on his thumb continued to worsen. (Doc. 150 at 70:14-20). On August 9, Plaintiff wrote a grievance that included complaints regarding the worsening pain in his thumb and his desire for medication to treat that issue. (Doc. 150 at 71:5-14; Doc. 162-15 (Grievance 4104)). Plaintiff submitted Grievance 4104 the next day, August 10. *Id.*

18

On August 21, the HCUA filled out a response and signed the grievance, stating, "per offender medical record review, Dr. Ek prescribed Bactrim to treat an infection of the L thumb. The infection is causing swelling, and the swelling is what causes discomfort. If the antibiotic works, the swelling will go down and the discomfort will decrease. Over the counter pain relievers are available in the commissary. Offender may utilize those medications." (Doc. 162-15).

On September 15, 2020, Grievance Officer R. Luecke signed the grievance officer's report for Grievance 4104 recommending denial based on near-verbatim duplication of the HCUA's response; the Chief Administrative Officer signed and dated the report the same day, concurring with the grievance officer's recommendation that the grievance be denied. (Doc. 162-16).

The HCUA did not question Dr. Ek's treatment determination, discuss the issue with Plaintiff, or otherwise perform substantive review, and grievance officers do not substantively review the HCUA's response. (Doc. 162-11 at 69:9-13; 162-9 at 76:11-19). IDOC cannot identify a single instance when it granted relief for a medical grievance. (Doc. 162-9 at 112:4-20). The ARB has stated it

19

is "unqualified to dispute medical opinion/review" to make medical decisions, and that "treatment is at the discretion of the IDOC physicians." (Doc. 162-17 at 1; 162-18 at 1).

Mr. Stephenson, of the ARB, testified repeatedly that he is "not qualified" to make medical decisions. (Doc. 150 at 135:20-136:18; 144:4-8). When assessing a medical grievance, the ARB looks at whether an inmate is receiving "treatment of some kind" but will not evaluate the appropriateness of that treatment. (Doc. 150 at 144:4-13). The ARB does have a physician that it can consult, but Stephenson has not done so "in a long time." (Doc. 150 at 138:7-11).

Plaintiff received the final determination, through the prison mail, denying Grievance 4104 "sometime shortly on or before" September 20, 2020. (Doc. 150 at 72:12-15). Plaintiff testified that he signed the grievance and submitted it for ARB review on September 20, 2020. Asked how he is sure that he did so on that date, Plaintiff testified, "I'm sure because I was still trying to get help. I was still trying to get pain medication. And they were not giving it to us, so I had to appeal to the ARB to see if they can resolve the issues of me not getting the medication I needed." (Doc.

20

150 at 73:7-12). Plaintiff was mindful of the 30-day deadline that he had in order to timely appeal the Chief Administrative Officer's decision. (Doc. 150 at 73:13-19).

Plaintiff testified that he did not recall other specific occurrences on September 20, 2020, such as specifics as to whether the facility was on lockdown, whether he went to yard that day, whether he received phone calls that day, or whether he ate in his cell or in the dining hall. (Doc. 150 at 45:1-47:6).

Defendants did not present testimony by anyone with personal knowledge to rebut Plaintiff's testimony that he placed the appeal in the mail on September 20, 2020.

IDOC has no basis to doubt that Plaintiff signed the grievance officer's report on September 20, 2020. (Doc. 162-9 at 86:9-12). IDOC's 30(b)(6) witness Friese testified that he "would assume" Plaintiff submitted his ARB appeal "on 9/20 of '20 because that's the day he signed it …." (Doc. 162-9 at 86:18-22). Friese also testified that IDOC does not know the date IDOC personnel would have collected Plaintiff's appeal from the designated mailbox, nor does it know what date IDOC personnel gave Plaintiff's appeal to the United States Postal Service. (Doc. 162-9 at 86:23-87:7).

21

Once Plaintiff submitted his appeal to the box, he had no
control over when it would be ultimately mailed to the ARB;
outgoing mailboxes are maintained by IDOC personnel, who oversee
collecting mail, processing it, and delivering it to USPS for delivery.
(Doc. 163-4 at 10:15-23; 11:4-12; 14:16-25 (Grites Dep. Tr.
Rough)).

Danville Mailroom Supervisor Grites testified that if an inmate
seeks to appeal a grievance to the ARB they may place the appeal in
one of the six prison mailboxes at Danville, that mailroom staff
collect mail from the mailboxes at about 7:30 a.m. Monday through
Saturday, that the mail is then sorted and legal mail including mail
to the ARB is logged, that mail collected by mailroom staff is logged
on the same day it is collected, that Plaintiff mailed his appeal of
Grievance 4104 sometime between December 24, 2020, and
December 28, 2020, and that the only mail from Plaintiff to the ARB
between September 15, 2020, and December 31, 2020, was
collected by mailroom staff and deposited in the US Mail on
December 28, 2020, based on the documentation in the legal mail
log. (Doc. 163-4 at 11:6-12:3, 17:8-19, 89:15-91:4).

22

The outgoing legal mail log from Danville does not show outgoing mail from Plaintiff to the ARB in September 2020. (Doc. 163-4 at 91-101). The mail log does not record mail from Plaintiff to the ARB until December 28, 2020. (Doc. 163-4 at 157).

The outgoing mail log contains significant errors, alteration of dates by IDOC staff, missing entries for outgoing mail, and numerous other unexplainable errors. (Doc. 162-3 at ¶¶ 1, 3-7, 9-12). Of high relevance here, the outgoing mail log fails to show outgoing mail that the ARB received from Plaintiff, while Plaintiff was at Danville, that must have passed through the mailroom, regarding the appeal of a different grievance. (Doc. 162-3 at ¶9).

Ms. Grites testified that it takes three hours to process the approximately 1,600 items of outgoing mail sent daily by inmates, (Doc. 163-4 at 14:6-12), regardless whether one or two mailroom workers are working on a given day and regardless whether the day follows a day such as a Sunday or holiday when no mailroom workers process mail. (Doc. 163-4 at 78:14-21).

The ARB received Plaintiff's appeal of Grievance 4104 on December 31, 2020. (Doc. 150 at 130:17-132:24). On July 7, 2021, the ARB returned Grievance 4104 to Plaintiff without addressing it

23

on the merits because it had received Plaintiff's appeal more than 30 days past the date of the Chief Administrative Officer's decision. (Doc. 150 at 130:17-132:24).

**B. <u>Analysis</u>**

**1. Law on Exhaustion of Remedies**

"The PLRA instructs, '[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.'" *Smallwood v. Williams*, 59 F.4th 306, 313 (7th Cir. 2023).

The issue of exhaustion is properly raised through a motion for summary judgment, and a court should resolve the issue before reaching the merits of a prisoner's case. *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008); *see also Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999) ("[T]he court must not proceed to render a substantive decision until it has first considered § 1997e(a).").

Defendants bear the burden of proving a plaintiff failed to exhaust his administrative remedies. *Banks v. Patton*, 743 F. App'x 690, 695 (7th Cir. 2018).

Although a prisoner must exhaust the grievance procedures prescribed by the institution, "a prisoner need not exhaust remedies if they are not available." *King v. Dart*, 63 F.4th 602, 606 (7th Cir. 2023) (quoting *Ross v. Blake*, 578 U.S. 632, 636 (2016)).

The unavailability of a grievance process "lifts the PLRA exhaustion requirement entirely and provides immediate entry into federal court." *Hernandez v. Dart*, 814 F.3d 836, 840 (7th Cir. 2016). "The term 'available' is given its ordinary meaning, and it does not include any requirement of culpability on the part of the defendant." *Lanaghan v. Koch*, 902 F.3d 683, 688 (7th Cir. 2018).

### 2. Application to the Facts Here

Here, based on the testimony and documents introduced into evidence at the hearing, the Court finds Plaintiff has satisfied the exhaustion requirement.

**<u>February 16, 2020, grievance.</u>** The Court finds Plaintiff submitted the February 16, 2020, grievance, copying the grievance and retaining the grievance copy presented at the hearing. Because

Plaintiff did not receive a response, the Court finds he has discharged his exhaustion requirement via this grievance.

The content of this grievance plainly grieves the claim Plaintiff brings in this Court. (Doc. 162-8). The Court, after personally observing Plaintiff's demeanor, tone of voice, and overall presentation, finds credible his testimony that he submitted this grievance and that he never received a response. Plaintiff's testimony is corroborated by the copy of the grievance he retained for his own records. Defendants did not provide testimony of anyone with personal knowledge to challenge Plaintiff's testimony.

Hansen's testimony that Plaintiff never submitted this grievance was not based on personal knowledge. Rather, she based that opinion on the lack of grievance office stamps on the copy of the grievance that Plaintiff produced and the lack of notation in Plaintiff's CHAMPS summary. But the copy produced by Plaintiff would not have stamps on it, as it was an unsubmitted copy retained by Plaintiff. And the CHAMPS summary is not reliable enough to refute by negative inference Plaintiff's testimony - Plaintiff's CHAMPS log is in fact verifiably missing certain entries related to the processing of other grievances. (Doc. 162-2 at ¶ 5-7).

26

Defendants have not carried their burden of proving by a preponderance of the evidence that Plaintiff did not submit the February 16, 2020 grievance. Because Plaintiff submitted this grievance yet never received a response, he has exhausted his available remedies as to that grievance. *King*, 63 F.4th at 606.

**July 25 grievance, Grievance 4012.** The Court finds Plaintiff submitted Grievance 4012 and never received a response to it from Danville officials. Plaintiff testified credibly that he asked correctional counselor Hansen about the lack of response. His testimony is corroborated by the testimony of Mason, who witnessed Plaintiff enquiring about missing grievance responses. With the benefit of personally observing Plaintiff at hearing, the Court finds his testimony credible.

The CHAMPS summary's notation that this grievance was returned to Plaintiff is insufficient to undermine the credibility of Plaintiff's testimony. IDOC staff testified that the CHAMPS notation does not confirm actual personal delivery of a grievance response to an inmate; rather, it indicates that staff assert that they placed the grievance response in the institutional mail. No one with personal knowledge even testified that the grievance response was in fact

placed in the institutional mail – instead testimony was presented as to what the general process is. Although IDOC *could* institute a program whereby grievance responses would be returned in person, with receipt documentation, IDOC in fact does not maintain such a system. Defendants have failed to meet their burden to demonstrate that Plaintiff received a response to Grievance 4012.

Defendants assert that because Plaintiff has no documentation regarding follow-up inquiries about this grievance his testimony should be disbelieved. However, Plaintiff has no burden to prove that he either a) did not receive the grievance response, or b) did or did not follow up on the grievance. Rather, it is Defendants sole burden to show Plaintiff failed to take the steps available to him to exhaust this grievance. Because the evidence indicates Plaintiff never received the grievance response he has discharged his exhaustion obligation. *See, e.g., Brengettcy v. Horton*, 423 F.3d 674, 682 (7th Cir. 2005) (finding administrative remedies were exhausted where the plaintiff never received a response to his grievance).

**<u>August 9, 2020, grievance, Grievance 4104.</u>** There is no dispute that Plaintiff submitted Grievance 4104 or that he

completed the grievance at the institutional level. The dispute here is whether Plaintiff mailed his appeal to the ARB on September 20, 2020 or whether, as Defendants contend, he failed to do so until December 2020 after the deadline to appeal had elapsed.

Plaintiff testified credibly that he submitted his appeal to the ARB, via institutional mail, on September 20, 2020. The Court finds compelling Plaintiff's testimony regarding the significant pain he was experiencing, and his testimony that he was focused on doing everything he could to pursue medical care. Defendants' attempt to undermine Plaintiff's credibility by asking him specific questions about what he ate that day, whether he went out on the yard, and the like, are unpersuasive. The Court acknowledges Plaintiff's difficulty remembering certain details. However, his lack of memory as to these details does not undermine the credibility of his testimony that he mailed his appeal to the ARB on September 20, 2020.

Plaintiff's testimony is corroborated by the grievance appeal signed and dated September 20. It is also corroborated by Mr. Friese's testimony that IDOC has no basis to doubt that Plaintiff signed the grievance officer's report on September 20, 2020, (Doc.

162-9 at 86:9-12), and that he "would assume" Plaintiff submitted his ARB appeal "on 9/20 of '20 because that's the day he signed it ...." (Doc. 162-9 at 86:18-22).

Defendants seek to rely on Mailroom employee Grites' testimony, which was in turn based on her review of mailroom legal mail logs. Grites' testimony and the mailroom logs are insufficient to undermine Plaintiff's credible testimony, corroborated as it is. Though Grites was confident Plaintiff did not place his grievance appeal in the mail until at least December 24, 2020, she has no personal knowledge regarding Plaintiff's appeal. And the record is clear that the mailroom log is beset with extensive errors, including, notably, errors where mail that Plaintiff sent to the ARB regarding another grievance *was not logged*. (Doc. 162-3 at ¶9).

The Court finds based on the above, Defendants have failed to meet their burden of showing Plaintiff failed in his responsibilities regarding appeal of the August 9 grievance. Rather, the evidence shows that Plaintiff complied with his responsibilities, and for unknown reasons processing of his appeal to the ARB was delayed. Plaintiff is not required to do more.

**<u>Lack of substantive review of medical grievances.</u>** As an
independent basis for denial of Defendants' request to dismiss this
case for failure to exhaust, the Court also, separately, finds that
IDOC failed to provide Plaintiff with an available medical grievance
procedure, and thus he would be excused from the grievance
requirement even in the absence of the earlier determination herein.

IDOC has admitted that it defers ruling on medical grievances
to the Health Care Unit Administrator, (Doc. 162-9 at 31:17-18),
who, in turn, simply reviews the inmate's medical file and does not
question or substantively review the provider's decisions. (Doc. 162-
11 at 68:2-69:13). IDOC admitted that medical grievances receive
no substantive review after the initial highly deferential review by
the facility HCUA. (Doc. 162-9 at 31:21-32:4; 74:16-19). And Mr.
Stephenson of the ARB testified that he was not qualified to make
medical determinations, that he simply looks to see if a prisoner is
getting "treatment of some kind," and that although the ARB can
consult with a physician on medical issues it rarely does so. (Doc.
150 at 135-144).

The Court finds that IDOC's deferral of medical grievance
review to the HCUA, who in turn does nothing more than reiterate

31

the care an inmate is already receiving, does not amount to an
"available grievance procedure." IDOC has admitted that for all
practical purposes there is no substantive review of medical
grievances in nearly all cases, and that there was no substantive
review of Plaintiff's medical grievances in this case. The Court
therefore finds that Plaintiff lacked an available administrative
remedy for his medical grievances. *Dole*, 438 F. 3d at 809. To the
extent this ruling is inconsistent with the Court's Summary
Judgment Order (Doc. 126), finding that Danville had an available
grievance process, Plaintiff's Motion to Reconsider (Doc. 139) is
granted. See *Terry v. Spencer*, 888 F.3d 890, 892 (7th Cir. 2018);
*see also* Fed. R. Civ. P. 54(b).

**Ms. Vollen-Katz's Testimony.** The Court found Ms. Vollen-
Katz's testimony regarding failures of the IDOC grievance process
and IDOC mail process compelling and disheartening. However,
because Ms. Vollen-Katz lacks personal knowledge regarding any
facts related to Plaintiff's specific situation, because the information
she reported regarding missing grievances and lack of response to
grievances was anonymous and anecdotal, and because her
personal knowledge related to mail delays was not specific to

32

Danville Correctional Center, the Court has not relied upon Ms.

Vollen-Katz's testimony in reaching its conclusions in this Order.

**IT IS THEREFORE ORDERED:**

1) **Plaintiff exhausted his available administrative remedies as to the February 16, July 25, and August 9, 2020, grievances, and these claims will proceed for adjudication on the merits.**

2) **Plaintiff's Motion to Reconsider [139] is GRANTED to the extent this Order conflicts with the Court's Order [126].**

3) **This matter is referred to Magistrate Judge Karen L. McNaught to set a status conference regarding resolution of outstanding discovery disputes.**

ENTERED: February 14, 2024.

<u>s/Sue E. Myerscough</u>
SUE E. MYERSCOUGH
U.S. DISTRICT JUDGE